## SAMUEL PALAPALA *v.* PAAUHAU SUGAR PLANTATION COMPANY.

### DECIDED: MAY 20, 1903.

1.  Where the method used in transferring sugar from a wharf to a boat sustained in position only by its oars in the open sea, was shown to be the following:

    The man in charge of the derrick and winch on the landing first suspends the sling load of sugar out over the boat, and there holds it to await a signal from the men in the boat when they are ready to have it lowered into the boat; and it was shown in the special instance complained of, that no signal was given for him to lower the sling load, containing some 1,250 pounds of sugar, into the boat, but that he did so without warning to the men in the boat, thereby severely injuring one of the crew thereof, and the man in charge of the winch claimed that the boat was lifted up on a big wave and struck the under side of the sling of sugar, and that the injury to the member of the crew resulted from that fact, without any negligence on the part of the winch man; *Held*, that if the boat had risen upon the big wave as claimed, and the sailor had been lifted up with the boat and injured, yet the same wave would have carried the boat past the sling load of sugar, which, if held in position by the winchman, would have remained suspended even after its impact with the boat; and the fact that the sling load of sugar did not remain suspended, but remained in the boat on top of the unconscious sailor, shows conclusively to the mind of the court that the winchman had negligently let go his hold of the sling load of sugar.

2.  Where it was shown that the winchman had entire control of the winch on the wharf, and was subject to no orders from any one in relation to the lowering of the sling loads of sugar save the signals from the men in the boat when they were ready to receive the same; and where it appeared that the winchman either saw, or, if he looked, could have seen, the incoming waves; *Held*, that by the mere raising or lowering of a lever he could control the position of the sling load, and if the conditions of the accident were such as are claimed by him, it would still have been but the work of a mo-

ment for him to have raised the sling load out of the way of the wave and the boat, and thus have avoided the accident, if he had exercised such vigilance as was incumbent upon him.

3. The greater the danger, the greater the care required of the winchman in the exercise of his control over the machinery in his charge.

4. A person of ordinary intelligence will not purposely expose himself to danger.

5. The winchman was an employe of the Paauhau Sugar Plantation Company, engaged in the prosecution of its work, and the said company is charged with responsibility for his careless and negligent acts done in the course of his employment and resulting in injury to libellant.

IN ADMIRALTY. LIBEL *in personam* FOR DAMAGES FOR INJURIES.

*J. J. Dunne*, proctor for libellant.
*Holmes & Stanley*, proctors for libellee.

ESTEE, J. ⌐This is a suit in admiralty *in personam* to recover the sum of $15,000 for personal injuries sustained by the libellant while engaged in loading a cargo of sugar into the American steamship "Helene."

The facts appear to be these: The libellant is a seaman on board of the steamship "Helene;" the respondent, the Paauhau Sugar Plantation Company, was, at the time of the injury, and now is, a corporation, organized under the laws of the state of California, and engaged in business in the Territory of Hawaii under the laws thereof. The said respondent operates a sugar plantation and wharf at Paauhau, on the Island of Hawaii, and sugar is shipped and discharged from said wharf into vessels afloat upon the navigable waters of the port of Paauhau.

On the afternoon of March 19, 1903, the date of the injury complained of, the "Helene" was anchored in the port of Paauhau to receive from said wharf certain sugar for transportation elsewhere; the Master of said "Helene" ordered libellant to go with certain others of the crew to said wharf to get a load of sugar in one of several large boats belonging to the ship, used for that purpose; the libellant obeyed these orders, and together

with said crew consisting of four men besides himself, namely: Kewiki, Toka, Kia, and Hina, went from the "Helene" to the wharf; that the boat in which they were, was not made fast to the wharf but was kept in position with the oars, the surface of the wharf being considerably elevated above the surface of the boat; said wharf being some twenty-two and one-half feet above sea level.

The process by which the sugar was transferred from the wharf to the boat is admitted to be as follows:

"On said wharf there was a derrick so constructed as to be capable of being swung out over the edge of said wharf so that sugar hoisted thereby would be suspended over the water; attached to the upper end of this derrick was a block and at its heel there was another block, and through these two blocks a wire fall was rove; at one end of this fall was attached a hook used to hoist the sling loads of sugar while the other end of said fall led to the steam winch which was used to hoist the sugar to the end of the derrick."

It appears further that when a sling load of sugar was hoisted to the end of the derrick, the said derrick was then swung out so that such sling load of sugar would be over the water. It then became the duty of the winchman on the wharf, to lower the said slingload of sugar part way down, and then hold it to await a signal from the crew in the boat, that signal notifying the winchman when to let the sugar descend into the boat.

All of the appliances, gear and machinery used in the operation of transferring the sugar belonged to the respondent, with the exception of the rope slings in which the sugar was transferred from the wharf to the boat; these latter belonging to the steamship. But no complaint is made as to these rope slings having been defective or as having contributed to the injury.

The winch was in charge of an employe of the respondent.

On the day of the injury, it seems that a sling load of sugar was hoisted to the end of the derrick and suspended over the water partly over the boat, the crew of which were endeavoring to so maneuver said boat as to place it in a proper position to

receive the said sling load.    That while this was being done, said
winchman let go the sling load of sugar containing some ten
bags of a gross weight of 1250 pounds, which precipitated the
sugar suddenly into the boat, thereby striking the libellant,
knocking him down, severely bruising him and breaking his
collar bone.

The libellant was removed to the "Helene" and from there
to the plantation hospital at Paauhau, where he remained for
two days and was then taken to the U. S. Division of the Queen's
Hospital  in Honolulu, where he remained from the 24th day
of March, 1903, when the "Helene" reached Honolulu, until
the 6th day of May, undergoing treatment for his injuries.

The libellant was at the time of the injury some twenty-one
years of age, a strong, healthy man, and earning $7.50 a week
as seaman on board the "Helene." He has been unable to work
at his vocation since the injury.

It is claimed by libellant that his injuries were the  result
of the carelessness and negligence of the respondent, through
the negligent act of the winchman who suddenly and without
warning let go the sling load of sugar before the crew in the
boat had given the signal in accordance with the established
method, and before any signal of any kind had been given from
the boat. and also by the careless and negligent manner in which
the machinery and gear were set in motion by the said winch-
man.

While the respondent claims that after the slingload of sugar
was suspended over the water, the winchman received a signal
from the men in the boat to lower the sling load part way down;
that he did so and held it there awaiting a further signal to
lower the slingload into the boat, when suddenly the boat was
lifted up by a big wave towards the sugar, and the libellant
was then struck and injured by coming in contact suddenly
with the sling of sugar.

The injury is therefore undenied.    The cause alone being
disputed.    The question then presented is, was the accident the
result of the negligence of the winchman in letting go the sling
load of sugar without notice from the crew in the boat, or was

it the result of a big wave which thrust the boat up towards the suspended sling load of sugar and thus caused the injury to the libellant?

The method pursued as shown by the uncontradicted evidence in this case was for the man in charge of the winch on the wharf at Paauhau, to suspend the sling load of sugar over the boat which was to receive it, and hold it there until he got a signal from the crew in the boat that they were ready for the sugar, when he slowly lowered it into the boat, two of the crew usually "trimming" it, in the technical language used, or steadying it gradually into place. This was done both before and after the accident on that day, as both Captain Nicholson of the "Helene" and Westovey, an employe of the respondent in charge of the landing at Paauhau, testified that about one thousand sacks of sugar were delivered aboard the "Helene" on that day, one sling load having been transferred before the accident occurred. Each of these sling loads contains ten sacks of 125 pounds each, or a total of 1250 pounds to the load.

That the business of transferring sugar from the landing at Paauhau to vessels lying out in the open sea is a dangerous one because of the methods employed and the conditions surrounding the transaction, is clear; and especially is this so when the weather is stormy and the sea consequently rough, rendering more than usual care necessary in the handling of the instrumentalities employed.

There seems to be considerable difference of opinion between libellant's witnesses and those of respondent as to just how rough the sea was on the afternoon of March 19, 1903, when the accident occurred. Naka, one of the Japanese employes of the plantation, testified that "the sea was very rough. . . .with high waves, many of which came up on the landing and wet the sugar." It is in evidence uncontradicted, that the height of the landing is 22½ feet above the surface of the water. If the testimony of this witness is correct, taken in connection with the admitted height of the landing above the sea, then the natural inference to be drawn is that these waves must have been at least

22½ feet in height in order to have wet the sugar lying on the wharf.

Captain Nicholson of the "Helene," who stated that "the waves came up on the landing and the sugar got wet," and Westovey in charge of the landing, who said that "the sea was very rough," both unite in testifying that on the afternoon of the accident, notwithstanding these enormous waves, about 1000 sacks of sugar were loaded from the landing into these boats and discharged into the "Helene." This sugar must have been dry. Its commercial value would have been destroyed at least temporarily, if wet with the salt water, or until it had been put through the milling process again, which evidently was not done so far as these 1000 sacks of sugar were concerned; although Westovey testified that if the sugar got wet it had to be taken back to the mill again. It would seem if the waves had been of the character described, none of the sugar on the landing could have escaped a wetting.

The four men in the boat who had been engaged with the libellant in the work of transferring this sugar, and who certainly of all people, should know best about the character of the sea in which they were working, being in an open boat, sustained in position only by the oars, all testified to the fact that while the weather had been rough in the forenoon and possibly somewhat rough in the afternoon, as it was necessary to get out the canvas to cover the sugar to protect it from the salt spray, yet it was calm enough to work in the afternoon.

Hina, one of these boatmen, says: "It had been quite rough in the forenoon; but after lunch it was all right." Kiwiki, another of these men, testified as to the weather on that day, that, "in the morning it was windy and rough, but in the afternoon it calmed down." Toka, also one of the boat's crew, said: "the coast there is not always rough; on that day it was rough in the morning but not in the afternoon; while Kia, the boat steerer, testified "the weather was calm enough for work; it was quite calm in the afternoon.... at no time that afternoon did the waves interfere with the loading of the sugar."

It appears that the boat in which these men were working was about twelve or thirteen feet from the rocks on the shore. This was the testimony of Palapala, the libellant, and is uncontradicted. It would seem apparent that if these waves were running twenty-two and a half feet high, that it would be an impossibility for the men to work in such a sea. The boat would have been in danger of being dashed to pieces on the rocks. This fact seems to render more probable the testimony of the boat's crew as to the comparative smoothness of the sea, as the work was prosecuted both before and after the accident.

The winchman had knowledge that the sea was rough. He testified that the "weather was awful rough that day." He also stated that he "could see many big waves rolling in." He further testified that he suspended the sugar over the boat and while so suspended, that one of these big waves came and lifted up the boat, which struck the sling load of sugar underneath, and the accident resulted. This was practically the testimony of all the respondent's witnesses as to the cause of the accident, most of whom were at a distance; Westovey stating that he was 150 feet away, and Captain Nicholson that he sat on the deck of the "Helene," 350 feet away.

The winchman also testified that after the libellant was injured, he hoisted the sling load of sugar off from the unconscious body of libellant in response to a signal from the boat to do so. This he should have done either with or without a signal, and it is immaterial whether he raised the sling voluntarily or in response to a signal.

Westovey and Naka testify that when the sling struck the libellant he was standing up in the boat with his arms extended. This does not appeal to the common sense of the Court in view of the after effects. If the waves were as high as is insisted upon by the respondent's witnesses and this boat being raised up against the sling load of sugar, it does not seem reasonable to suppose that the libellant would have deliberately placed himself in danger of being struck, but would have instinctively avoided or made some attempt to get out of the way of the danger. Such is the common experience of mankind. The instinct of self-

preservation is strong in human nature, and stands for proof of care. *Allen v. Willard*, 57 Pa. St., 347; *Cleveland & Pittsburg R. R. Co. v. Rowan et ux*, 66 Id. 393; *Thomas, Adm'x, etc.. v. The Delaware, Lackawanna & Western R. Co.*, 8 Fed. 729, 731. A person of ordinary intelligence will not purposely expose himself to danger. *Cassidy v. Angell, Town Treasurer, etc.*, 12 R. I. 447.

But this testimony of Westovey and Naka is flatly contradicted by the crew in the boat and by Fujimoto, one of the defendant's own witnesses, and who testified that he saw the accident. The testimony of the crew is all to the point that no warning was given of the coming of the sugar, but that Palapala was straightening up after attempting to haul the canvas out from the bottom of the boat to cover the sugar placed there by the first sling load. It appears that this canvas is always carried for the purpose of protecting the sugar from the salt spray and the washing of the waves into the boat while the sugar is being transferred.

The libellant himself says:

"Just before the accident, I was fixing up the canvas to keep the sugar dry from the waves. As I stood up, I was struck. The canvas was not quite out then."

Kia, the steerer, said "that when he was struck, Palapala was on the starboard side of the boat working on this canvas."

Hina testified "that at the time of the accident, Palapala was still working on the first sling load trying to cover it with the canvas. He got no warning that the sling load was coming. We did not expect it to fall."

Kewiki's testimony is to the same effect, while Bob Toka says, "we gave no signal to lower sugar because we had to get the canvas that was under the first sling load. We had to get that canvas out before receiving another sling load."

The winchman testified on the stand that he took his signals for the final lowering of the sugar from the men in the boat, who alone had the right to signal him, and that he took these signals from no other source. He does not claim to have received any signal whatever before the accident, which is in line

with the testimony of libellant's witnesses, but states that the accident was unavoidable in that while the sugar was suspended over the boat awaiting the signal, the big wave came, the boat rose with the wave and struck the sling load of sugar from underneath, resulting in the injury to libellant. It is in proof that after the accident, the sling load of sugar was hoisted up again. Says Hina, "the sugar fell on him at the edge of the boat, and when it was hoisted, he fell into the boat......he lay still, he could not move."

So, too, Kewiki says, "when the sugar struck him he gave a kind of grunt and then fell down in the boat.... When the sugar was hoisted off of him he fell from the edge into the bottom of the boat."

It would seem that a necessity existed for the sling to be hoisted, which is very significant. Even if, as contended by respondent, those big waves had actually been running and one of then had lifted up the boat as argued, and the libellant had been lifted up in the boat on this wave and had struck the sling load on the under side and thus had been injured, yet the same wave would have carried the boat past the sling load of sugar, which, if held in position by the winchman, would have remained suspended even after its impact with the boat. But instead of this, we find the sling load of sugar in the boat on top of the unconscious man, showing conclusively to my mind that the winchman had let go his hold of the sugar.

While I am constrained to think from the weight of the evidence, that the weather was not unusually stormy on that afternoon, yet even if there were high seas running these could have been seen by the winchman and he should have seen and guarded against them.

Westovey, who had been in charge of the landing for a little over a month, testified that he was familiar with the winch house; that he had been in there and knew from personal experience that the winchman could see the incoming waves; that he had himself seen them. The winchman stated that the weather was very rough on that day and that "he could see many big waves rolling in."

As was said by the Supreme Court of the State of California, in the case of *Glascock v. C. P. R. R. Co.*, 73 Cal. 137, 141:

"If he looked, he saw; and having age and faculties to understand the dangers, is charged with a knowledge of them, and was bound to act upon that knowledge as a prudent and cautious man would under the circumstances."

The winchman had entire control of the winch on the landing and could raise and lower the sling as he pleased. He was subject to orders from no one in relation to the lowering or raising of these slings of sugar, save the signals from the boat's crew when they were ready to receive the same. By the mere raising or lowering of a lever he could control the position of the sling load; and, if the conditions of the accident were as claimed by respondent, it would have been but the work of a moment for the winchman to have raised the sling load out of the way of the boat, and thus have avoided the accident if he had exercised such vigilance as was incumbent upon him.

In the case of *Shumacher v. St. Louis Railway Co.*, 39 Fed. 174, the Court said that—

"The highest duty of man is to protect human life or the person of a human being. That duty is never performed so as to escape responsibility until all possible care under the circumstances is exercised."

In view of all the conditions surrounding the loading of this sugar and with which the winchman was necessarily familiar, the responsibility on his part in prosecuting his portion of the work was made greater. If the danger increased by the stormy condition of the weather, then the greater the care required of the winchman in the exercise of his control over the machinery in his charge.

Says the Supreme Court of the United States in the case of *Mather v. Rillston*, 156 U. S. 391, 398-9—

"* * * where the occupation is attended with danger to life, body or limb, it is incumbent on the promoters thereof and the employers of others thereon to take all reasonable and needed precautions to secure safety to the persons engaged in their prosecution, and for any negligence in this respect from

which injury follows to the persons engaged, the promoters or the employers may be held responsible and mulcted to the extent of the injury inflicted...... Occupations, however important, which cannot be conducted without necessary danger to life, body, or limb, should not be prosecuted at all without all reasonable precautions against such dangers afforded by science. The necessary danger attending them should operate as a prohibition to their pursuit without such safeguards."

*The Anchoria*, 113 Fed. 982; *In re California Navigation and Improvement Co.*, 110 Id. 670.

After a careful consideration of all of the testimony in the case, I am of opinion that the injury was not caused by the boat being raised up on a big wave, but that it resulted from the careless and negligent act of the winchman in suddenly lowering the sling load of sugar without warning, and before any signal had been given from the men in the boat.

The winchman was an employe of the respondent, engaged in the prosecution of its work, and as such employe, the respondent is charged with responsibility for his carelessness and negligent acts done in the course of his employment and resulting in the injury to libellant.

The amount of damages to be awarded is usually dependent upon the pain and suffering occasioned by the injury, the age, habits of life, and occupation of the libellant, his ability to earn, and the effect of the injury upon all these things. *Grant v. Union Pacific Railway Co.*, 45 Fed. 673, 683.

The libellant was at the time of the injury twenty-one years of age and a sound, strong healthy man, with so far as the evidence shows, no bad habits. As a result of the accident, his right clavicle, or collar bone, was broken, and he was otherwise severely bruised. He was for two days at the plantation hospital at Paauhau, and then removed to the U. S. Marine Division of the Queen's Hospital, at Honolulu, where he remained undergoing treatment for his injuries until the day before the commencement of this trial, when he was discharged. He is not yet able to work, or to lift any object of any considerable weight, a serious proposition to a man following his vocation, that of a

sailor, in these island waters. While it appears that the bones have knit and that libellant is able to move his shoulder, yet he suffers pain intermittently. Dr. Wood, called for respondent, testified that he examined the libellant on May 6th, some weeks after the injury, and that he found "a united fracture of the right clavicle;" but that the "libellant would not have perfect use of his arm for a considerable time," and that the fractured clavicle is "a permanent injury." He also stated that to be able to perform his work as a sailor, his muscles would have to be trained.

Dr. Cofer, also called for respondent, does not seem to have taken a very active part in the examination of libellant, stating that he looked on at Dr. Wood's examination; but in the main his testimony is corroborative of that of Dr. Wood, admitting, however, that the fractured bone "will never be as it was before." Dr. Humphris, as it appears, examined the libellant on four different occasions and testified that the injury was a very severe one, and stated that he believed the intermittent pain from which the libelalnt is suffering was due to the shoulder joint being in either a neuralgic or tubercular condition, inclining somewhat to the latter. Upon the trial, an examination was made of the libellant by Dr. Wood on behalf of respondent and Dr. Humphris of libellant, and as a result of this examination, a very serious condition was shown to exist. The pulse of the man was then one hundred, or about twenty degrees above the normal, and his temperature indicated one hundred and a half or two degrees of fever. Both doctors united in their testimony as to these facts. Dr. Wood stating that "there was something wrong with the man."

Something evidently must be wrong with libellant; and in view of all the evidence in this case, and especially of the evidence as to the sound, healthy condition of libellant previous to the accident, it is reasonable to suppose that his present condition is due to the injury and resultant therefrom. Dr. Humphris stated that if the pain suffered by libellant in the shoulder joint is neuralgic, that it will be a considerable time before his earning capacity is restored; if the pain is due to a tubercular condition,

often the result of the impact of a heavy body on the surface of a joint, then his capacity to earn his living as before the accident can never be restored. Whether the joint is neuralgic or tubercular, was not made clear from the testimony of these physicians, but it is clear that the condition of said joint is not normal, and that such condition was due to the injury. In any event, it is plain that his present and immediate future earning capacity is totally impaired.

I think libellant is entitled to a judgment, in addition to the amount of wages which he has lost since the date of the accident, in such a sum as will compensate him for the injury and suffering consequent thereon. I will, therefore, award him the sum of three thousand dollars in full of all damages for the injury, and the further sum of $65.35, being the amount he would have earned as wages between the 19th day of March, 1903, and the date hereof, making a total of $3,065.35, together with costs of suit.

Let judgment be entered accordingly.